A90A1447. TYLER et al. v. PEPSICO, INC.
(400 SE2d 673)

COOPER, Judge.

Appellant Claudette Tyler brought this action to recover damages for personal injuries she sustained while attempting to open the aluminum cap on a two liter bottle of Pepsi-Cola with a nutcracker. When the jaws of the nutcracker were squeezed and the cap was turned, the cap exploded from the bottle striking appellant in the eye. The complaint was based on theories of strict liability, negligence and fraud, and a loss of consortium claim was subsequently added. Appellants charged that the threads on the aluminum cap were inadequately formed at the point of manufacture; that the threads were too shallow; that when the cap was turned, the pressure from the carbonated beverage inside the bottle forced the cap from the bottle and that the labelling should have included a warning. The retail seller, the bottling company ("bottler") which bottled and sold the product, the manufacturer of the aluminum cap and appellee, the franchisor/licensor and manufacturer of Pepsi syrup, were named as defendants. The trial court granted appellee's motion for summary judgment on all counts, and this appeal followed.

1. In their first enumeration of error, appellants contend the trial court erred in holding that appellee was not a manufacturer under OCGA § 51-1-11 (b). Appellants argue that because appellee had substantial control over the production, sale and distribution of the bottler's products by virtue of the exclusive bottling agreement between appellee and the bottler, "for all intents and purposes" appellee is a manufacturer. The record shows that appellee manufactures syrup, which it sells to licensed bottling companies who mix it with other ingredients to produce Pepsi-Cola. Pepsi-Cola is then bottled and dis-

tributed to retailers by the bottling companies within their sales territories. In the instant case, appellee has no ownership interest in the bottler and is paid only for the syrup. The finished product is sold by the bottler for its own account. The exclusive bottling agreement provided that Pepsi-Cola would be the bottler's only cola product; that sufficient amounts of syrup would be purchased to satisfy the demands of the bottler's territory; that delivery trucks and route salesmen's uniforms would bear appellee's trademark; and that the bottler was authorized to purchase only those bottles, caps and cartons approved by appellee and was obligated to maintain a sufficient level of bottles to meet peak season demands. The agreement recites that "[i]n the use, handling and processing of Beverage concentrates, the bottling of the Beverage and the filling, crowning, labeling, packaging and selling of the Beverage the bottler [would] follow precisely the instructions of the Company given from time to time. . . ." (The term "Company" referred to appellee.) Under the agreement, appellee was entitled to periodically suggest to the bottler the price per case and deposit charge, and the bottler was required to vigorously push the sale of the beverage throughout its territory to secure "full distribution up to maximum sales potential." Additionally, the bottler agreed to actively cooperate in all advertising campaigns and product control programs and to allow appellee to conduct site inspections of the manufacturing and distribution processes. Finally, if the bottler failed to perform or comply with any of the terms of the agreement, appellee was authorized to terminate the agreement.

Finding no Georgia decision directly on point with the instant case, the trial court, in its order, provided an extensive review of authority from other jurisdictions on the issue of whether a licensor or franchisor may be liable for the acts or omissions of its licensee. While other jurisdictions have adopted a variety of theories to hold non-retailing, non-manufacturing entities liable based on their control over the production process, in *Morgan v. Mar-Bel, Inc.*, 614 FSupp. 438 (N.D. Ga. 1985), the federal district court recognized that Georgia had not addressed the issue and refused to adopt any of those theories in the absence of Georgia authority. In *Morgan*, the court identified the "three situations in which an entity is deemed a manufacturer for the purposes of strict liability [in Georgia]:

(a) an actual manufacturer or designer of the product; or

(b) a manufacturer of a component part which failed and caused the plaintiff injury; or

(c) an assembler of component parts who then sells the item as a single product under its own trade name. [Cits.]" Id. at 440. The court determined that the defendant, who contracted with a manufacturer to design and construct a prototype of a piece of equipment and who inspected and tested the equipment during testing and offered

suggestions, did not fit within any of the categories listed above and held that "[a]ny supervision or suggestions by [defendant] were not substantial enough to equate them with the manufacturers or designers of the product. [Cit.]" Id. at 441. Rejecting plaintiff's argument that defendant's control of specifications and quality standards of the item, which was constructed by another, was sufficient to impose liability, the court observed that Georgia courts had not given the term "manufacturer" such an expansive reading and determined instead that OCGA § 51-1-11 was to be strictly construed. Id.

The question of whether a franchisor might be liable as a manufacturer pursuant to OCGA § 51-1-11 (b) (1) is a matter of first impression in this state. The statute provides, "[t]he manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to any natural person who may use, consume, or reasonably be affected by the property and who suffers injury to his person or property because the property *when sold by the manufacturer* was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained." (Emphasis supplied.) This court has previously recognized the need to control the use of a trade name in a franchise agreement authorizing such use, and even in those instances where the franchise agreement provides for compensation on a royalty basis, an agency relationship is not created. *Frey v. Pepsico, Inc.*, 191 Ga. App. 585 (1) (382 SE2d 648) (1989). *Frey* involved a licensing agreement between PepsiCo, Inc., and a bottler, which was virtually identical to the agreement in the instant case, and the plaintiff in *Frey* argued that PepsiCo was vicariously liable for the negligence of a driver hired by the bottler to drive a Pepsi-Cola delivery truck on the theory that PepsiCo controlled the bottler's operations. The court found that PepsiCo "retained a substantial amount of control over the Bottler's manufacturing and packaging operations" by virtue of the licensing agreement, but declined to find PepsiCo vicariously liable. Id. at 586-587. The court determined there was "no basis for an inference that either the Bottler or its driver was acting as servants or instrumentalities of PepsiCo with respect to the operation of the delivery vehicle . . ." because PepsiCo had no supervisory authority to dictate the hiring and firing of route salesmen or the time, manner and method of their employment and because the evidence indicated that the bottler and PepsiCo were operating as distinct and independent entities. Id. at 586-587.

In the instant case, we likewise recognize the bottling agreement's function of protecting the Pepsi trade name and find that despite the relationship created by the agreement, appellee is not a manufacturer as contemplated by OCGA § 51-1-11 (b), which is in derogation of the

common law and " 'must be strictly construed or limited strictly to the meaning of the language employed and not extended beyond plain and explicit terms.' [Cits.]" *Daniel v. American Optical Corp.,* 251 Ga. 166, 167 (1) (304 SE2d 383) (1983).

In *Ellis v. Rich's, Inc.,* 233 Ga. 573 (212 SE2d 373) (1975) and its progeny *Williams v. City Ice Co.,* 190 Ga. App. 744 (1) (380 SE2d 341) (1989); *Thorpe v. Robert F. Bullock, Inc.,* 179 Ga. App. 867, 868 (348 SE2d 55) (1986)), the term "manufacturer" as used in OCGA § 51-1-11 has been interpreted to refer to the actual manufacturer of an item. Appellants rely upon *Pierce v. Liberty Furniture Co.,* 141 Ga. App. 175 (233 SE2d 33) (1977) for the proposition that appellee, who is not the *actual* manufacturer, is liable *as* a manufacturer. In *Pierce,* the court held that "an entity which assembles component parts and sells them as a single product under its trade name is a 'manufacturer' within the meaning of [OCGA § 51-1-11]." Id. at 179. In the instant case, the bottler mixes the syrup with carbonated water and other ingredients to formulate Pepsi-Cola, which it bottles in two liter containers and secures with aluminum caps. Although appellee retained the right to periodically inspect the bottler's operation and had the authority to discontinue supplying syrup in the event of a breach of the agreement, we do not find that this activity constitutes "assembly" as required by *Pierce.* In addition, contrary to appellants' contention, "under OCGA § 51-1-11, the 'manufacturer' must *sell* the product. . . ." *Barry v. Stevens Equip. Co.,* 176 Ga. App. 27, 28 (1) (335 SE2d 129) (1985). We recognize that "selling" does not require the exchange of title for payment as long as the manufacturer places the produce "in the stream of commerce," that is "put[s] the product in the hands of and under the control of a consumer. . . ." *Robert F. Bullock, Inc. v. Thorpe,* 256 Ga. 744, 745 (353 SE2d 340) (1987). However, the bottler, not appellee, distributed and sold the bottle in this case, and the proceeds from the sale went exclusively to the bottler.

Appellants urge that the Second Restatement of the Law of Torts, § 400, which the court relied upon in *Pierce,* requires a finding that appellee was an "apparent" manufacturer. The Restatement provides, "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." The courts in this state have applied the Restatement to sellers of products who appear to be the manufacturers, *English v. Crenshaw Supply Co.,* 193 Ga. App. 354 (1) (387 SE2d 628) (1989); *Moody v. Sears, Roebuck & Co.,* 324 FSupp. 844 (S.D. Ga. 1971), and have apparently defined the phrase, "puts out as his own product," to mean supply to others. Since we have determined that appellee was not a seller and did not supply the bottled product to others, the Restatement is inapplicable in the context of this case, and appellants'

reliance on the Restatement is misplaced. Accordingly, we find the trial court did not err in finding that appellee was not a manufacturer under OCGA § 51-1-11.

2. Appellants next contend the trial court erred in holding as a matter of law that appellee was not negligent and owed no duty of care to appellants.

(a) Relying on appellee's status as a manufacturer, appellants contend appellee breached a duty to warn of the danger of injury due to "weakly threaded closures" pursuant to OCGA § 51-1-11 (c). Inasmuch as we have determined that appellee is not a manufacturer, we find that the trial court was correct in granting summary judgment to appellee on the failure to warn claim.

(b) Appellants contend the trial court erred in finding that they were not third-party beneficiaries of the contract between appellee and the bottler. Appellants maintain that by reserving the right to inspect the bottler's facilities, appellee had a contractual duty, or at least voluntarily assumed a duty, to insure the safety of the product in the hands of consumers. "A third-party beneficiary contract is one in which the promisor engages to the promisee to render some performance to a third person. [Cit.]" *Stewart v. Gainesville Glass Co.*, 131 Ga. App. 747, 753 (206 SE2d 857) (1974). "In order for a third party to have standing to enforce [such a contract] it must clearly appear from the contract that it was intended for his benefit. The mere fact that he would benefit from performance of the agreement is not alone sufficient. [Cits.]" *Backus v. Chilivis*, 236 Ga. 500, 502 (224 SE2d 370) (1976). While appellee admits that product safety was one of the purposes of the inspections, there is no evidence that the contract was specifically intended to benefit appellants or that appellee voluntarily assumed a duty to appellants. The record also does not demonstrate any failure by appellee to exercise due care which increased the risk of harm or that appellee undertook the bottler's duty to inspect. *Huggins v. Aetna Cas. &c. Co.*, 245 Ga. 248, 249 (264 SE2d 191) (1980). To the contrary, in response to interrogatories, the bottler admitted that it was responsible for the daily operation of its plant. Finally, there is no evidence that appellants relied on appellee's inspections. Id. See generally *Huggins v. Standard Fire Ins. Co.*, 166 Ga. App. 441, 442 (304 SE2d 397) (1983). This contention is without merit.

(c) Appellants argue that the trial court erred in finding that res ipsa loquitur did not apply. We disagree. "Res ipsa loquitur is a rule of evidence which permits an inference of negligence to arise when the necessary elements are present. [Cits.]" *Cotton States Mut. Ins. Co. v. Nunnally Lumber Co.*, 176 Ga. App. 232, 236 (3) (335 SE2d 708) (1985). In the instant case, there is a failure of proof of an essential element of res ipsa loquitur — the requirement that the injury

result from "an agency or instrumentality within *exclusive* control of the defendant." (Emphasis supplied.) Id.

3. Appellants enumerate as error the trial court's finding that their fraud claim was not supported by the evidence. Appellants contend appellee was aware of similar incidents and that the product was inherently dangerous and argue that the failure to warn constituted reckless disregard equivalent to fraud under OCGA § 51-6-2. The record does not reveal that appellee knew of prior accidents occurring in quite the same manner as in the instant case, i.e., the grasping of the aluminum cap with a nutcracker or similar vise and an ensuing explosion, that appellee was aware of past misapplication of the aluminum cap or misapplication in the instant case, nor does the record demonstrate that there was an intent to deceive. See generally *Lively v. Garnick*, 160 Ga. App. 591 (1) (287 SE2d 553) (1981). This claim is without merit, and the trial court did not err in granting summary judgment as to this count and all other claims against appellee.

*Judgment affirmed. Banke, P. J., and Birdsong, J., concur.*

DECIDED DECEMBER 4, 1990 —
REHEARING DENIED DECEMBER 20, 1990 —

*W. Jan Jankowski*, for appellants.

*Painter, Ratterree & Connelly, Paul W. Painter, Jr., Brannen, Wessels & Searcy, David R. Smith, Carr, Tabb & Pope, W. Pitts Carr, Eric E. Huber*, for appellee.