Gary SEASTROM and Jo Ann
Jacobsen, Appellees,

v.

FARM BUREAU LIFE INSURANCE
COMPANY, Appellant,

and

Ann Lewis and Bruce Brinkman,
Defendants.

Farm Bureau Life Insurance
Company, Appellant,

v.

Gary Seastrom and Jo Ann
Jacobsen, Appellees.

No. 97–1164.

Supreme Court of Iowa.

Sept. 9, 1999.

Clark G. McDermott and Dale A. Knoshaug of Hanson, Bjork & Russell, L.L.P., Des Moines, for appellant.

Frank J. Comito of Neu, Minnich, Comito & Hall, P.C., Carroll, and Colin J. McCullough of the McCullough Law Firm, Sac City, for appellees.

Considered by McGIVERIN, C.J., and LARSON, NEUMAN, SNELL, and CADY, JJ.

SNELL, Justice.

Farm Bureau Life Insurance Company appeals and Gary Seastrom and Jo Ann Jacobsen cross-appeal from judgments entered on the plaintiffs' claims for breach of contract and first-party bad faith. The case arises due to the death of the insured, Alice Seastrom, before her life insurance policy was issued by Farm Bureau. A jury gave the plaintiffs a verdict of $350,000 for breach of contract on the life insurance policy, $12,500 for the plaintiffs' bad faith claims, and $87,500 in punitive damages. We affirm in part, reverse in part, and remand for entry of a judgment consistent with this opinion.

I. Background Facts and Prior Proceedings

On April 19, 1995, Bruce Brinkman, an insurance agent for Farm Bureau, and Ann Lewis, a Farm Bureau manager, met with Alice and Wayne Seastrom to discuss estate planning and the Seastroms' possible acquisition of life insurance. At that time Alice was 74 and Wayne was 76 years of age. The Seastroms had two children, plaintiffs Gary Seastrom and Jo Ann Jacobsen. The Seastroms owned a farm of approximately 500 acres which was operated by their son. The Seastroms wished to have an estate plan in which they could leave their farm to both children but provide sufficient funds to allow Gary to buy out Jo Ann's share and to pay any inheritance taxes.

At the April 19 meeting, Lewis obtained copies of the Seastroms' wills and information related to their estate planning goals. Wayne and Alice completed a trial application for a $300,000 joint last-to-die life insurance policy which Brinkman subsequently submitted to Farm Bureau. Brinkman was later informed Wayne was uninsurable and only Alice was to proceed to have a physical exam. Alice completed both the physical exam and a diabetic questionnaire.

On July 10, 1995, Lewis prepared a lengthy document captioned "Estate Analysis Report." The report contained a description of Alice's anticipated estate inventory and related costs and taxes. The report also contained projections of the premiums required for different levels of life insurance coverage for Alice. Each projection was labeled "THIS PROJECTION IS NOT A CONTRACT. IT IS AN ILLUSTRATION ONLY." One of the projections listed a $21,300 annual premium for a death benefit of $350,000.

Lewis and Brinkman met with the Seastroms on July 12, 1995, and Lewis presented the Estate Analysis Report to them. The report was left with the Seastroms when the meeting concluded.

Lewis and Brinkman met once again with Alice and Wayne on August 4, 1995. On that date they again reviewed the Estate Analysis Report and the Seastroms indicated they wished to proceed with Lewis's recommendations. Brinkman completed another application for life insurance for Alice with Gary and Jo Ann designated as the owners and beneficiaries of the policy. Brinkman did not complete the entire application, but instead wrote the words "Everything taken care of on trial app." over one portion of it.

Gary Seastrom was present for part of the August 4 meeting and he wrote a $5325 check for the quarterly insurance premium. Both Wayne and Gary claim Lewis directed Brinkman to fill in the amount of $400,000 on the application. Lewis and Brinkman deny that any representations were made about the amount of coverage being provided and they claim the $400,000 figure was not inserted into the application until after the August 4 meeting. Lewis and Brinkman claim no determination had been made as to the exact amount of coverage which would be acquired, although Brinkman thought it might be between $300,000 and $400,000.

Lewis claims the $400,000 amount was later added to the application because she knew that amount would adequately cover the Seastroms' estate planning needs. If, after consultation with other professionals such as an attorney or accountant, it became apparent less coverage was needed, Lewis could then "order down" and obtain an amount less than $400,000. Lewis indicated it was preferable to apply for a larger amount than was expected to be necessary because you could always order down. However, if you applied for too small an amount and had to later increase it, the application process would have to start over and additional underwriting would have to be completed.

There is a dispute about whether Brinkman provided Alice, Wayne, or Gary with the conditional receipt, a perforated form located at the bottom of the final page of

the life insurance application. The conditional receipt purports to limit Farm Bureau's liability to no more than $250,000 if an applicant dies prior to the issuance of a life insurance policy.[1]

Brinkman and Lewis claim Brinkman filled out the receipt, detached it, and gave it to Alice. Brinkman claimed he told the Seastroms "This is a receipt saying that we received that amount for the deposit and that's why I'm giving this to you." Lewis testified she heard Brinkman tell the Seastroms that "This receipt is evidence that you have a policy." Lewis, herself, told the Seastroms "they had coverage."

Gary and Wayne deny that Brinkman ever gave the conditional receipt to Alice. In any case, Farm Bureau admits that Brinkman and Lewis never explained the terms or effect of any conditional receipt nor did they inform the Seastroms that any interim insurance coverage they had just purchased was limited to $250,000.

On August 12, 1995, Alice died. Farm Bureau had not yet completed its processing of her application and no life insurance policy had been issued. Farm Bureau had never had a situation in which an applicant for life insurance had died after completing the application but before a policy had issued and the face amount of the application exceeded the amount provided by the conditional receipt. Over the course of the next two months, a senior underwriter, a vice-president, and Farm Bureau's legal department investigated the claim. At a meeting on September 22, 1995, Lewis and Brinkman met with members of Farm Bureau's legal department to discuss in detail their meetings, conversations, and transactions with the Seastroms. Farm Bureau's claims committee met on September 27 to discuss the claim in detail. Ultimately, Farm Bureau decided that while its liability might be limited to only $50,000 under the conditional receipt, it was going to pay the $250,000 maximum provided thereunder.

---

1. The portion of the life insurance application which was signed by Alice and Gary Seastrom provided in relevant part:

> It is agreed that ... (2) Except as provided in the conditional receipt attached hereto and unless it is delivered to the applicant and the premium payment therein described is made, no insurance shall take effect unless a policy has been issued by the Company, physically received and accepted by the applicant and the entire first premium paid ... (3) No agent ... is authorized to pass on acceptability for insurance or to make, modify, or discharge any contract of insurance or waive any of the Company's rights or requirements....
>
> STATEMENT regarding payment made with application: I have paid $5325 with this application for [life insurance] ... and I accept the terms of the conditional receipt detached from this application.
>
> The conditional receipt specified that:
>
> Except as otherwise expressly provided below, no insurance is provided by this receipt or in connection with or as a result of having completed the application, and no insurance will be provided by this receipt or in connection with or as a result of having completed this application unless the person or persons proposed for insurance in this application is insurable in ac-

cordance with the Company's rules and standards of insurability with respect to the policy or policies applied for and the level of insurance applied for.

> ....
>
> The total of all proceeds payable by the Company in connection with the interim insurance provided by this receipt, if any, shall be equal to the face amount of the insurance applied for subject to the following limitations and exceptions:
>
> (1) If any person proposed for insurance is insurable on the DATE OF INSURABLILITY, but only at a rate which is higher than the rate applied for, the total proceeds which may be payable shall not exceed $50,000.
>
> (2) In no event shall the total proceeds which may be payable exceed $250,000.
>
> The payment for which this receipt is given will be applied to the premium due on any policy issued as a result of or in connection with the application. If no such policy issued, the amount of the payment will be returned to the person from whom it was received.
>
> No agent or employee of the Farm Bureau Life Insurance Company has any power or authority to change or modify any of the provisions of this Conditional Receipt.

On October 10, 1995, Farm Bureau tendered a check for $250,000 to Gary Seastrom and Jo Ann Jacobsen along with a refund of $4,517.44 of the premium Gary had paid. Gary and Jo Ann claim their acceptance of the check was contingent upon their filing a release of all claims against Farm Bureau. Farm Bureau disputes this. The Seastroms rejected the check.

Gary and Jo Ann subsequently filed suit against Farm Bureau, Lewis, and Brinkman, raising numerous claims including breach of contract, express and implied warranty, negligent and fraudulent misrepresentation, first-party bad faith, and a request for punitive damages.[2] Farm Bureau filed a petition for a declaratory judgment seeking a determination of its liability under the conditional receipt. The actions were consolidated.

Immediately before trial, Gary and Jo Ann settled with Brinkman and their claims against him were dismissed.[3] Farm Bureau argued the release of any claims against an agent operates as a release of the claims against the principal and the plaintiffs' remaining claims against it should be dismissed. The trial court rejected this argument distinguishing between situations in which a principal's liability is contractual and those in which it is based solely upon vicarious liability.

Several of the plaintiffs' claims were disposed of by motions for summary judgment and directed verdict, and only the breach of contract, bad faith, and punitive damages claims were submitted to the jury. The jury found there had been an oral contract for insurance in the amount of $350,000, and the conditional receipt did not constitute a written contract for insurance benefits on Alice's life. The jury further found the plaintiffs had proven Farm Bureau had conducted itself in bad faith in denying their claim and it awarded $5000 to Jo Ann and $7500 to Gary.[4] Finally, the jury found Farm Bureau's conduct constituted a willful and wanton disregard for the rights of others and it awarded the plaintiffs $87,500 in punitive damages.

Farm Bureau filed a combined motion for judgment notwithstanding the verdict and new trial. The district court denied the motion with respect to the contract and bad faith claims, but vacated the award of punitive damages.

Farm Bureau has appealed claiming the trial court erred in failing to rule the plaintiffs' release of Brinkman operated as a release of Farm Bureau, in admitting parol evidence, and in failing to direct a verdict or grant a new trial on the breach of contract and bad faith claims. The plaintiffs have cross-appealed, arguing the trial court erred in vacating the jury's award of punitive damages.

## II. Release of Brinkman

■ We first address the contention that the plaintiffs' settlement with Brinkman operated as a release of their claims against Farm Bureau. In arguing Brinkman's release absolved it of any further liability, Farm Bureau relies on *Biddle v. Sartori Memorial Hospital,* 518 N.W.2d 795, 799 (Iowa 1994), a case in which we held a plaintiff's release of a malpractice claim against a physician extinguished any further claim the plaintiff may have had against the defendant hospital based on a theory of vicarious liability.

Our holding in *Biddle* was limited to the situation in which the release of an agent operated as a release of the principal from

---

2. Alice's estate was originally included as a party, but the district court later determined that it was not a proper party and excluded any reference to it in the judgment entry.

3. The express terms of the release purported to reserve any claims the plaintiffs had against Lewis and Farm Bureau.

4. In a separate instruction relevant to the bad faith claim, the jury found Farm Bureau had not been "stubbornly litigious."

any vicarious liability for the agent's tortious conduct. *Biddle* has no application to the bad faith and punitive damages claims presented in this case since they are based on Farm Bureau's own conduct and are not solely matters of vicarious liability.

It does not appear we have previously addressed whether the release of an agent operates as a discharge of a principal's liability for a breach of contract. The Restatement (Second) of Agency provides in relevant part:

> Recovery of judgment against the agent of a disclosed or partially disclosed principal for failure of performance of a contract to which the agent is a party does not thereby discharge the principal unless the agent and principal were joint contractors.

Restatement (Second) of Agency § 184(1) (1958). Decisions from other jurisdictions which follow this restatement provision include *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.,* 630 F.2d 250, 274–75 (5th Cir.1980), *Clifton Cattle Co. v. Thompson,* 43 Cal.App.3d 11, 117 Cal.Rptr. 500, 503–04 (1974), *Wheaton Lumber Co. v. Metz,* 229 Md. 78, 181 A.2d 666, 670 (1962), *National Trout Festival, Inc. v. Cannon,* 32 Mich.App. 517, 189 N.W.2d 69, 71 (1971), and *Orrock v. Crouse Realtors,* 823 S.W.2d 40, 42 (Mo.Ct.App.1991).

▪ We find the reasoning of section 184 and the above cases to be persuasive. We hold the plaintiffs' settlement with Brinkman did not operate as a release of Farm Bureau's liability on the contract claim and the district court did not err in denying Farm Bureau's motion to dismiss.

### III. Parol Evidence

▪ With respect to the plaintiffs' contract claim, Farm Bureau contends the trial court erred in allowing the admission of parol evidence that varied from the terms of the conditional receipt. Farm Bureau's reliance on the parol evidence rule is misplaced. "When applicable, the parol evidence rule excludes extrinsic evidence which is solely offered for the purpose of varying, adding to, or subtracting from a *written* agreement." *Kroblin v. RDR Motels, Inc.,* 347 N.W.2d 430, 433 (Iowa 1984) (emphasis added). Parol evidence is admissible to prove the existence of an independent oral contract. *See Cox v. Fleisher Constr. Co.,* 208 Iowa 458, 463, 223 N.W. 521, 523 (1929). Although Farm Bureau claims its liability was governed by a written contract (the conditional receipt), the plaintiffs argued the circumstances of this case had given rise to a separate oral contract and parol evidence was admissible to prove its existence.

### IV. Oral Contract

▪ Farm Bureau claims the trial court erred in submitting the plaintiffs' claim for breach of oral contract to the jury and in denying its motions for directed verdict and new trial. We review the trial court's denial of a motion for directed verdict for the correction of errors at law. *Crookham v. Riley,* 584 N.W.2d 258, 265 (Iowa 1998).

> We review the evidence in the same light as the district court and determine whether a fact question was generated. When reviewing the denial of a motion for a directed verdict or judgment notwithstanding the verdict, we view the evidence in the light most favorable to the nonmoving party.

*Mensink v. American Grain,* 564 N.W.2d 376, 379 (Iowa 1997) (citation omitted). If there is substantial evidence to support a claim the motion should be denied. *Crookham,* 584 N.W.2d at 265. Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion. *Id.* Even if the facts are undisputed, the case should be submitted to the jury if reasonable minds could draw different inferences from the evidence. *Id.*

▪ We review the denial of a motion for a new trial for abuse of discretion. *Bredberg v. Pepsico, Inc.,* 551 N.W.2d 321, 326 (Iowa 1996). If the jury verdict is not

supported by sufficient evidence and fails to effectuate substantial justice, a new trial may be ordered. *Id.*

▮▮ To sustain proof of an oral contract, the terms must be sufficiently definite for a court to determine with certainty the duty of each party and the conditions relative to performance. *Burke v. Hawkeye Nat'l Life Ins. Co.*, 474 N.W.2d 110, 113 (Iowa 1991). A review of the record reveals sufficient evidence to support the jury's finding of an oral contract. At the conclusion of the August 4 meeting the Seastroms had paid a quarterly premium and were told they had coverage and "a policy." Alice had already had a physical and had completed a diabetes questionnaire as part of the trial application process. Brinkman's notation on the August 4 application indicated everything had already been "taken care of" on the prior trial application.

The Seastroms had previously been given projections which indicated the amount of coverage for which Alice qualified would be tied to the amount of the premium which was paid. The Seastroms paid the quarterly premium which matched the amount required for the $350,000 policy projection.

▮▮ The jury was presented with conflicting evidence as to whether the Seastroms had been provided with a conditional receipt at the August 4 meeting. When evidence is in conflict, "we entrust the weighing of testimony and decisions about the credibility of witnesses to the jury." *Biddle*, 518 N.W.2d at 800. There was sufficient evidence from which the jury could find Farm Bureau never provided the Seastroms with a conditional receipt.

We hold there was sufficient evidence from which the jury could infer there was an oral contract for life insurance, that the contract was not limited by the terms of a conditional receipt, and the exact amount of coverage was to be subject to the application of Farm Bureau's projections to the actual amount of premium which was paid.

The certainty of the terms of the oral contract is not undermined by the fact that the Seastroms may have believed they had acquired $400,000 worth of coverage rather than $350,000 as found by the jury. The figure "$400,000" was inserted upon the application by Farm Bureau's agent. However, there was substantial evidence that Farm Bureau had represented to the Seastroms that the final amount of coverage would be based upon the application of its projections to the amount of premium which was paid. Under these circumstances there was a sufficient certainty as to how the final amount of coverage would be determined.

Having viewed the evidence in the light most favorable to the plaintiffs, we conclude there was substantial evidence to support their claim of oral contract. The district court properly denied Farm Bureau's combined motion for directed verdict and new trial.

## V. Bad Faith

▮▮ Farm Bureau argues there was insufficient evidence to submit the plaintiffs' claim for bad faith and the trial court erred in failing to direct a verdict or grant its motion for a new trial. To be successful in a first-party bad faith claim, a plaintiff must prove by substantial evidence (1) the absence of a reasonable basis for denying the claim, and (2) that the defendant knew or had reason to know that its denial was without a reasonable basis. *Sampson v. American Standard Ins. Co.*, 582 N.W.2d 146, 149 (Iowa 1998). An insurance company has the right to challenge claims that are "fairly debatable" without being subject to a bad faith tort claim. *Id.* at 150. Thus, when an objectively reasonable basis for denying a claim exists, the insurer cannot be held liable for bad faith as a matter of law. *Id.* The debate may involve a dispute concerning an issue of fact or law. *Id.* The reasonable basis for denying the claim, however, must exist at the time the claim is denied. *Id.*

The focus of the plaintiffs' bad faith claim is their contention that there was a lack of proper investigation by Farm Bureau. They complain that Farm Bureau's claims committee never interviewed Brinkman or Lewis, the owners of the policy, or those present at the time the application was completed.

The record reveals Farm Bureau's legal department did investigate the claim. It met with Brinkman and Lewis for approximately two hours on September 22, 1995, to discuss in detail everything that had occurred with the Seastroms. While the claims committee may not have separately interviewed Brinkman and Lewis, it appears at least one person who was present for the September 22 meeting was also part of the claims committee.

It is clear Farm Bureau investigated the claim, even if such investigation was not as thorough or all-encompassing as the plaintiffs would have desired. "In a first-party bad faith claim, 'an imperfect investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim.'" *Id.* at 152 (quoting *Reuter v. State Farm Mut. Auto. Ins. Co.,* 469 N.W.2d 250, 254–55 (Iowa 1991)). In fact, where an insurer has an objectively reasonable basis to deny coverage, it has no duty to investigate further before denying the claim. *See Morgan v. American Family Mut. Ins. Co.,* 534 N.W.2d 92, 98 (Iowa 1995).

The existence of the conditional receipt and Brinkman's and Lewis's contention that the receipt had been given to Alice created a reasonable basis for denying the claim for $400,000 of coverage. The claim was "fairly debatable" and Farm Bureau was entitled to a directed verdict on the bad faith claim. We reverse that portion of the judgment entered on the bad faith verdict and remand the case for entry of a judgment consistent with this opinion.

## VI. Punitive Damages

In their cross-appeal the plaintiffs argue substantial evidence supported the jury's award of punitive damages and the trial court erred in vacating that award. We review the trial court's grant of a motion for judgment notwithstanding the verdict for the correction of errors at law. *Magnusson Agency v. Public Entity Nat'l Co.-Midwest,* 560 N.W.2d 20, 25 (Iowa 1997). We view the evidence in the light most favorable to the party against whom the motion was made, taking into consideration every legitimate inference that may fairly and reasonably be made. *Id.* Our only inquiry is whether there was sufficient evidence to justify submitting the claim to the jury. *See id.*

Generally, a breach of contract, even if intentional, is insufficient to support an award of punitive damages. *Id.* at 29. We will only uphold an award of punitive damages for breach of contract when the breach (1) constitutes an intentional tort, and (2) is committed maliciously, in a manner that meets the standards of Iowa Code section 668A.1 (1995). *Id.* That statute requires proof, by a preponderance of clear, convincing, and satisfactory evidence, that the defendant's conduct amounted to a willful and wanton disregard for the rights or safety of another. *Magnusson Agency,* 560 N.W.2d at 29.

A review of the record reveals there was insufficient evidence to support the claim for punitive damages. Farm Bureau had never had a situation in which an applicant for life insurance had died after completing the application but before a policy had issued and the face amount of the application exceeded the amount provided by the conditional receipt. Its decision to rely on the terms of the written conditional receipt when determining its liability was not malicious nor did it constitute an intentional tort. Even if Farm Bureau had required the execution of a release in conjunction with the tender of the $250,000 check, such conduct would not

rise to the level of a willful and wanton disregard for the rights of the plaintiffs. The trial court properly vacated the award of punitive damages.

## VII. Conclusions

The trial court correctly ruled that the plaintiffs' release of Brinkman did not operate as a release of Farm Bureau. We hold the trial court acted properly in admitting parol evidence to establish the existence of an oral contract and there was sufficient evidence to support the jury's finding of an oral contract for $350,000 in insurance coverage.

We hold the trial court erred in denying Farm Bureau's motion for a directed verdict on the bad faith claim as Farm Bureau had a reasonable basis for denying the claim and the claim was fairly debatable. Finally, we conclude the trial court properly granted a judgment notwithstanding the verdict with respect to the jury's award of punitive damages because Farm Bureau's conduct did not constitute an intentional tort and did not rise to the level of a willful and wanton disregard for the rights of the plaintiffs.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**